# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs October 26, 2010

## STATE OF TENNESSEE v. APRIL JENNIFER WARREN

**Direct Appeal from the Circuit Court for Blount County**
**No. C-15710     Jon Kerry Blackwood, Senior Judge**

---

**No. E2010-00740-CCA-R3-CD - Filed November 8, 2010**

---

The defendant, April Jennifer Warren, pled guilty in the Blount County Circuit Court to one count of voluntary manslaughter, a Class C felony. Pursuant to the plea agreement, the defendant agreed to a sentence of ten years a Range II, multiple offender, with the manner of service to be determined by the trial court. Following a sentencing hearing, the trial court sentenced the defendant to confinement. In this appeal as of right, the defendant contends that the trial court erred in denying her request for alternative sentencing. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**.

NORMA MCGEE OGLE, delivered the opinion of the Court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Stacy Nordquist, Maryville, Tennessee (at trial); and J. Liddell Kirk, Knoxville, Tennessee (on appeal), for the appellant, April Jennifer Warren.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Mike Flynn, District Attorney General; and Tammy Harrington, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

A Blount County Grand Jury indicted the defendant of the second degree murder of her live-in boyfriend, Charles Russell. Pursuant to a plea agreement, the defendant pled guilty to voluntary manslaughter and agreed to be sentenced outside her range to ten years as a Range II, multiple offender. The terms of the plea agreement left the manner of service of the sentence within the discretion of the trial court. Following a sentencing hearing, the trial court denied alternative sentencing and ordered the ten-year sentence to be served in

confinement. The defendant challenged the denial of alternative sentencing in a direct appeal to this court. See State v. April Jennifer Warren, No. E2008-01135-CCA-R3-CD (Tenn. Crim. App. at Knoxville, Dec. 1, 2009).

During the pendency of her direct appeal, "evidence of possible improper conduct by the trial judge came to light," so this court stayed the direct appeal and remanded the case for an evidentiary hearing concerning the alleged improper conduct. Warren, slip op. at 7. We ultimately reversed the sentencing decision of the trial court and remanded the case for resentencing, before a new trial judge, based upon our conclusion "that the trial judge's conduct [during the initial sentencing proceedings] was prejudicial to the judicial process" due to the trial court's ex parte contact with members of the victim's family concerning the sentencing decision. Id. at 9.

As summarized in this court's opinion from the defendant's first appeal, the evidence presented at the first sentencing hearing is as follows:

Doctor Darinka Mileusnic-Polchan, Chief Medical Examiner for Knox County, testified that she performed an autopsy on the victim. She said the "cause of death was a single shotgun wound to the left temple, which involved the eyes and the brain and perforated the skull." She said the victim's injuries were consistent with a tight contact shotgun wound, meaning the shotgun barrel was close, but not necessarily touching the skin. She said the victim would have lost consciousness immediately and would have died within a couple of minutes. The autopsy report and a photograph of the victim's shotgun wound were received into evidence.

The [Defendant's] mother, sisters, and brother testified that the victim and the Defendant fought often and that the Defendant usually had injuries all over her body. All admitted the Defendant had substance abuse problems. All said the Defendant would leave the victim after a fight and stay with them several times a week. The Defendant's brother, Eddie Warren, testified that he saw the victim push the Defendant, pull a gun on her, and "whip[]" a beer can at her. The Defendant's sister, Dulcie Gunter, testified that the victim swung a baseball bat at the Defendant and at her. Another sister, Wendy Warren, said that when she asked the victim's and the Defendant's daughter why the girl had laid a pillow over a doll and stomped on it, the girl replied, "That's what Daddy does to Mama." Ms. Warren said the Defendant told her the pillow lessened the bruising. Andrea Sutfin, Eddie Warren's fiancée, testified that she saw the victim kick and slap the Defendant while the Defendant lay on the floor and that Mr. Warren had to pull the victim off the

Defendant.

Shari Garner testified that she owned Subway restaurant in Vonore, Tennessee, and that the Defendant had worked for her off and on for two years. She said the Defendant was currently employed as an assistant manager. She described the Defendant as a good employee and agreed the Defendant would be reliable if granted probation.

Jessica Keith testified that she worked with the Defendant at Subway and that she was the victim's third cousin. She said the Defendant often had bruises and choke marks on her neck. She said the victim would repeatedly call the Defendant at work and argue. She said that on her manager's instruction, she once refused to let the victim talk to the Defendant and that the victim threatened to drive his truck through the restaurant. She said the victim had pushed the Defendant out of his truck, had pulled a gun on the Defendant, and had removed the license tags from the Defendant's car to prevent her from driving home.

The Defendant testified that she had a GED and had completed two years of classes at Pellissippi State Community College. When asked about alcohol and drug abuse, she admitted she started using alcohol at thirteen or fourteen years old and cocaine at eighteen or nineteen years old. She said that she stopped drinking and using cocaine in her twenties but that she started using both again after she began dating the victim in 1999. She said they moved in together after dating five months. She could not explain why she attended only two classes at Bradford Health Services after she was admitted for alcoholism in 1993. She confirmed that the two drug screens she had taken since the shooting were negative. She said she started working at Subway restaurants in 1999 or 2000. She said that the job would become stressful, that she would leave the position, and that she would return. She said that in between her jobs at Subway, she worked for her father and in construction.

The Defendant testified there were instances of violence before she moved in with the victim. She said the victim grabbed her hair and slammed her face into the front of his truck. She said that the victim's ex-wife claimed the victim had hit her but that the ex-wife did not give any details. She said she knew the victim had been charged with domestic violence. She described several instances when the victim beat her, including kicking her in the stomach when she was pregnant. She said she did not call the police or leave the relationship because she loved the victim and did not want him to get into

trouble. She said that they both used alcohol and crack cocaine and that much of the abuse occurred when the victim was intoxicated.

The Defendant testified that on the day of the shooting, she had gone to the doctor for a checkup following treatment she had received for a tubal pregnancy. She said that she returned home about 4:00 p.m. and that she drank some wine but did not take illegal drugs. She said that the victim was already at home and that he was drinking beer. She said that they left to go pick up the victim's paycheck, that they stopped at the dollar store, and that the victim remained in the car while she went inside. She said she observed a man she knew as a crack dealer talking to the victim, although she did not see an exchange. She said they returned home about 6:00 p.m. and smoked crack. She said that a friend of hers called wanting to buy marijuana and that the victim left to purchase some for the friend. She said that the victim called her to tell her he was on his way home and that when he did not return immediately, she called her sister to see if the victim was there, which he was. She said that when the victim returned home, they fought but that she could not remember about what. She said that the victim ordered her to leave and that as she took some belongings to her car, the victim grabbed her by the hair. She said that the victim released her and pushed her from behind as she walked out the door and that her belongings spilled onto the ground. When asked what she was thinking at that moment, she replied, "I was mad and sad and just tired." She said that she walked into the house and that she could barely remember going to the gun cabinet and grabbing the gun. She said she thought she grabbed shotgun shells. She recalled walking into the bathroom and closing the gun. She said the next thing she remembered was watching the victim fall backwards.

The Defendant testified that she did not remember the gun firing. She said the gun was the same one the victim had pointed at her on several occasions. She said she had never fired the gun and her intent had been to scare the victim, not kill him. She said that she was tired of being the one always made to leave and that she had wanted him to leave that time. She said that after the victim fell, she dropped the gun and called 9-1-1. She said that the 9-1-1 operator instructed her on how to perform CPR on the victim. She said that the police arrived and that she talked to an officer. The 9-1-1 recording and a responding officer's in-car video were received into evidence. She said that she spoke to officers the next day and that they took pictures of her bruises.

-4-

The Defendant testified that she had been convicted of driving under the influence (DUI) and driving on a revoked license but that she had no convictions for felonies or violent crimes. She said that she was responsible for the victim's death but that she had not planned the crime. She agreed she gave her consent to search her car and trailer and gave a blood sample because it was "the right thing to do." She said that she was still working as an assistant manager at Subway and that she had not been arrested for anything since the shooting. She said that her driver's license had been reinstated and that nothing prevented her from meeting with a probation officer. She said she lived with her mother. She agreed to attend alcohol, drug, or mental health assessments if the trial court determined that she needed to do so. On cross-examination, the Defendant testified that she could not remember whether the victim said anything to her immediately before he was shot. She admitted that after her release on bond, she used marijuana three or four times over a period of months. She said she believed the shooting was an accident, but she could not remember exactly what happened.

In the State's rebuttal, the victim's stepson, Daniel Ty Nguyen, testified that he saw the victim push the Defendant when the Defendant threatened to cut his telephone line in retaliation for his putting too much laundry detergent in the washing machine. On cross-examination, Mr. Nguyen said that on two occasions, he saw the Defendant slap the victim in the face. He said that the Defendant drank every day and used marijuana and that he found crack cocaine in a can under the bathroom sink. He said that his stepfather drank alcohol but that he never saw his stepfather use illegal drugs. On redirect examination, Mr. Nguyen testified that marijuana plants were grown inside the Defendant's closet. He said he did not know for sure whether they were grown by the victim or the Defendant.

Kenneth King testified that he had a relationship with the Defendant from September 2006 to December 2007 and that he saw her smoke marijuana perhaps five times at her sister's house. He said the Defendant would become belligerent when she drank alcohol and would want to fight. He said that the Defendant would push and punch him and that twice he pushed her. On cross-examination, Mr. King testified that he had proposed to the Defendant and that the Defendant had accepted. . . . He said he was sober when he threw the Defendant into a television console. He would not agree that the Defendant ended the relationship.

In the defense's surrebuttal, the Defendant testified that she was not

growing marijuana in her closet and that she gave police consent to search her house on the night of the shooting. She agreed that the police had not asked her anything about marijuana in her closet. She acknowledged that after the shooting she removed a can containing crack cocaine from under the [victim's] bathroom sink but that she left a can containing crack cocaine under her sink. . . . On cross-examination, the Defendant denied that she had ever hit or slapped Mr. King or the victim. She said that she did not have the gun to the victim's head, that the victim was standing at the toilet, and that she was standing in the middle of the bathroom. She testified that a diagram and a photograph she was shown accurately depicted the location of the victim's body after he had been shot. She said she did not move the victim's body.

Id., slip op. at 2-5.

Also relevant to this appeal is the evidence presented at the November 23, 2008 hearing concerning the defendant's request for bond during the pendency of her first appeal. As discussed in this court's first direct appeal opinion:

. . . . The Defendant's mother, Dolores Warren, testified that with the permission of the bail bondsman, the Defendant had traveled out of state and had returned. She said the Defendant continued to work at her job. She said she knew of nothing that would prevent the Defendant from reporting to a probation officer. She said that the Defendant kept her appointments with defense counsel and that she had not missed a court appearance. She said that the Defendant's original bond was $125,000 and that the Defendant would be living at her house if the Defendant were released on that bond. She said she had unsupervised visitation with the Defendant's daughter every other weekend. On cross-examination, Ms. Warren testified that during the time the Defendant had been on bond, the Defendant sometimes stayed with her boyfriend or with other family members. She agreed that she was supposed to supervise the visitation between the Defendant and the Defendant's daughter. When asked whether she had allowed the Defendant and the Defendant's daughter to be together unsupervised, she replied that a responsible adult was present "every time I know of." She agreed she heard testimony at the sentencing hearing about the Defendant's using drugs and alcohol while on bond, but she said she never saw it. She agreed that the Defendant had engaged in behavior of which she had been unaware.

The Defendant testified that while she was released on bond, she stayed with her mother and at Kenneth King's trailer, which was owned by her father

and was located two trailers away from her parents' house. She agreed that no conditions of her bond required her to stay at her mother's house. She said that if the trial court ordered it, she would be willing to live at her mother's house pending appeal. She said that she had received permission from her bondsman to travel out of state and that she had checked with him as required. She said she had worked for Subway companies for about seven years before she started working at Sheri Garner's Subway restaurant. She confirmed that she was employed as an assistant manager and that she was responsible for running the restaurant. She agreed that a custody battle over her daughter was ongoing and that she never took her daughter anywhere without her mother's knowledge and without another adult who had received her mother's consent, as required by the juvenile court.

The Defendant testified that she had a conviction for DUI from 1994, that she was sentenced to supervised probation, and that she had completed probation. She said she never missed a meeting with her probation officer or a court appearance. She said that since her release on bond in 2005, she had never missed a court appearance and had never failed a drug test. She agreed to undergo drug testing, alcohol and drug assessment, and alcohol and drug treatment if ordered by the court as a condition of her release on bond. She agreed that in the three years she had been out on bond, she had not acquired any new charges. She said she would do anything necessary to be released until her appeal was heard.

On cross-examination, the Defendant agreed that she had never faced a prison sentence and that her circumstances had changed since the last time she appeared in court. She said that before Kenneth King moved into the trailer owned by her father, she sometimes stayed at his residence when he was out of town. She said that she stayed with William Newton "a couple of times through the week" and that she sometimes stayed with her sister. She said that her mother did not know she was using alcohol and drugs and that she got the drugs from a friend. She agreed she was never around her daughter without another adult supervising the contact. On redirect examination, the Defendant testified that no revocations of bail had been filed against her and that there were no bond conditions against her drinking alcohol.

*Id.*, slip op. at 5-6. From the record, it appears that the original trial court revoked the defendant's bond pending appeal. After evidence of the trial court's improper contact with the victim's family was discovered, the newly-designated trial court held an evidentiary hearing concerning the impropriety, disqualified the original trial court, and granted the defendant bond pending appeal. Ultimately, the defendant filed a motion in this court requesting that her case be remanded for a new sentencing hearing based upon the original

trial court's improprieties, and the State did not oppose the motion.

On remand, the newly-designated trial court held a full evidentiary hearing concerning the defendant's request for alternative sentencing. At the March 4, 2010 hearing, the trial court reviewed and considered all the evidence presented at the first sentencing hearing, as previously discussed. Additionally, the parties presented evidence relevant to the defendant's conduct subsequent to the granting of her appeal bond.

Mike Caldwell of the Tennessee Department of Probation and Parole testified that he supervised the defendant from November 2008 until December 2009 while the defendant was on bond pending her first appeal. He said that the defendant kept all of her appointments except for one when she had a "transportation" problem. He said that following the missed appointment, the defendant indicated that she was considering returning to custody. He recalled giving two or three random drug screens to the defendant and that she passed all of the drug screens except for one which showed evidence of tampering. Mr. Caldwell said that the defendant accepted responsibility for the victim's death. An arrest warrant was entered by a stipulation to show that defendant was charged with criminal trespass on December 25, 2008.

Lori Blair, the victim's sister, expressed her desire that the defendant be sentenced to custody without any form of probation or alternative sentence.

Brenda Summey testified that she saw the defendant at the Dragon's Den, a local bar, sometime in September 2009. Ms. Summey sat at one end of the bar and talked to the defendant's sister, Dulcie Gunter. The defendant sat at the opposite end of the bar and "started giving [Ms. Summey] a hard time about . . . being . . . gay." Ms. Summey recalled that the defendant's sister told her to ignore the defendant because, the sister explained, the defendant was "crazy." Ms. Summey testified that the defendant was drinking beer. She recalled that the defendant walked over to them, reached across her sister's face, and tried to punch Ms. Summey. Ms. Summey said that the defendant was thrown out of the bar by the bartender, Debbie, after Debbie "whipped her." The record reflects that a violation of probation report was filed based upon this incident and the ensuing arrest.

Dulcie Gunter, the defendant's sister, testified that she had known Ms. Summey for approximately ten years. She denied seeing Ms. Summey at the Dragon's Den, and she said that Ms. Summey was lying about the altercation with the defendant. Ms. Gunter also testified that she and her mother went to pick up the defendant and victim's daughter, from the victim's mother's home on Christmas Day 2008. She denied that the defendant accompanied them to pick up the child. She denied that any of the purported witnesses to the defendant's alleged aggravated criminal trespass on that day were present when she and

her mother picked up the child. The record reflects that a violation of probation report was filed concerning the aggravated criminal trespass arrest.

The defendant's testimony concerning the tumultuous relationship she shared with the victim was consistent with that of the first sentencing hearing. She explained that their relationship was "rocky from the get-go" and involved both emotional and physical violence. She said that they both used cocaine and alcohol on occasion. She admitted that she became aggressive while drinking. She testified that she just wanted to scare the victim when she shot him and that she was "mad . . . tired emotionally, physically, [and] mentally just drained."

The defendant testified that she had complied with all the terms of her pretrial bond by maintaining employment and living with her mother. She said that she attended various treatment programs, parenting classes, and Bible study courses while incarcerated from July 2008 until she was released on bond in December 2008. The defendant said that after being released on bond, she attended Narcotics Anonymous meetings, Alcoholics Anonymous meetings, and anger management classes. She also underwent mental health treatment at Cherokee Mental Health Facility.

The defendant denied Mr. Nguyen's report that she had grown marijuana in her closet while living with the victim. She admitted that she had used drugs while on pretrial release, but she denied using drugs while on appeal bond. She said that Mr. King, Ms. Summey, and Ms. Russell were all lying about her violent behavior and violations of the terms of her bond release.

Based upon this evidence, the trial court denied alternative sentencing and imposed a ten-year sentence of confinement. The trial court accredited Ms. Summey's testimony concerning the assault. The trial court noted that the defendant "has had a history of drug and alcohol abuse" and characterized it as "the lifestyle that she chose and a lifestyle that she continued to engage in even after this event occurred." The trial court acknowledged the defendant's efforts to rehabilitate herself while incarcerated but said that her behavior while on release "mitigate[d] somewhat [those] successful efforts." Concerning the circumstances of the offense, the trial court disagreed that the defendant's "just [being] tired" of the volatile relationship with the victim rose to any level of provocation to warrant alternative sentencing. The trial court noted that, although the defendant was a favorable candidate for probation and had potential for rehabilitation, any sentence less than confinement would depreciate the seriousness of the offense and not serve a general deterrent purpose.

The defendant now appeals from the denial of alternative sentencing. She contends that she is statutorily eligible for a suspended sentence and that the trial court did not make

sufficient findings in support of its denial of alternative sentencing she asks this court to modify her sentence to one year of incarceration followed by supervised probation. The State contends that the defendant's drug and alcohol abuse and her continued criminal conduct after the commission of the offense reflects negatively on her potential for rehabilitation and justifies a sentence of confinement. Following our review, we agree with the State.

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the defendant in her own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210 (2006); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the defendant to demonstrate the impropriety of her sentence. *See* Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. See id. at (d); Ashby, 823 S.W.2d at 169.

The Sentencing Reform Act of 1989 encourages judges to utilize non-incarceration sentencing alternatives. See Tenn. Code Ann. § 40-35-103(6); see also State v. Ring, 56 S.W.3d 577, 585 (Tenn. Crim. App. 2001). But the Act also provides that certain offenders should be considered "favorable candidate[s] for alternative sentencing." Tenn. Code Ann. § 40-35-102(6). Although the defendant is statutorily eligible for alternative sentencing, she is not among those considered "favorable candidate[s]" because, although she was convicted of a Class C felony, she was sentenced as a multiple offender. Id. The trial court's decision to sentence a defendant to confinement should be based upon the following considerations:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

> (C) Measures less restrictive than confinement have frequently
> or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1). The trial court may also consider the applicable mitigating and enhancing factors under Tennessee Code Annotated sections 40-35-113 and 40-35-114 as well as "the potential or lack of potential for rehabilitation" in determining whether incarceration is appropriate. State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996); see also Tenn. Code Ann. § 40-35-103(5).

The trial court did not err in denying alternative sentencing. We disagree with the defendant's contention that the trial court failed to make sufficient findings in support of its denial of alternative sentencing. To the contrary, the trial court made very specific findings and outlined the reasons why alternative sentencing was not appropriate. In particular, the trial court stated that the need to avoid depreciating the seriousness of the offense and the need for general deterrence as well as the defendant's history of drug and alcohol abuse and continued criminal activity justified the denial of alternative sentencing. Significantly, with respect to the defendant's potential for rehabilitation, the trial court noted with favor the defendant's rehabilitative efforts while incarcerated. However, the trial court found, and we agree, that the weight of these efforts was mitigated by the defendant's behavior while on bond pending appeal. Accordingly, the record supports the trial court's findings, and our review gives us no reason to question its sentence.

_____
NORMA MCGEE OGLE, JUDGE